General Foods Corporation *v.* Pittsburgh, Appellant.

Argued October 4, 1955. Before STERN, C. J., STEARNE, JONES, MUSMANNO and ARNOLD, JJ.

*Oscar G. Peterson*, Assistant Solicitor, with him *Mortimer B. Lesher*, Solicitor, for school district et al., appellants.

*Robert Engel*, Assistant City Solicitor, with him *J. Frank McKenna, Jr.*, City Solicitor, for City et al., appellants.

*Frank W. Ittel*, with him *Carl E. Glock, Jr.*, *Frederick F. Mack, John W. Kuhnemund*, and *Reed, Smith, Shaw & McClay*, for appellee.

Opinion by Mr. Chief Justice Horace Stern, November 30, 1955:

These appeals are by the City of Pittsburgh and the School District of Pittsburgh from orders of the County Court of Allegheny County sustaining the contention of the General Foods Corporation that it is not liable for the assessments against it for the years 1948-1953 of mercantile license taxes imposed by the City and the School District.

Under the authority of the Act of June 25, 1947, P. L. 1145, as amended, the City of Pittsburgh enacted an ordinance which provided for the issuance of mercantile licenses and the imposition of mercantile license taxes for the year 1948 and annually thereafter upon every person engaged in the City in the occupation or business of vendor or dealer in goods, wares and merchandise, the tax, in the case of a wholesale vendor or dealer, to be at the rate of one mill on each dollar of the volume of the annual gross business transacted by him. By the Act of June 20, 1947, P. L. 745, as amended, there was imposed an annual mercantile license tax on every person engaged in any school district of the first class in the occupation or business of vendor or dealer in goods, wares and merchandise, the tax, in the case of a wholesale vendor or dealer, to be at the rate of one-half mill on each dollar of the volume of the annual gross business transacted by him.

Plaintiff, General Foods Corporation, claimed that it was not legally subject to these taxes on the ground that it was not engaged as a wholesale vendor or dealer in the City of the School District of Pittsburgh, but performed there merely supervisory and clerical functions. The arguments of counsel and the opinion of the court below are devoted largely to the question whether plaintiff's activities within the taxing juris-

dictions amounted to the *doing of business*,[1] but the exact issue is a much narrower one, namely, whether plaintiff was a *vendor or dealer* in Pittsburgh; if it effected sales in the City and the School District it was liable for the tax, otherwise not, no matter in what other business activities it was engaged there.

Plaintiff's business organization is somewhat complex. It is, as to Pennsylvania, a foreign corporation, with its main headquarters in New York. It sells principally to wholesale grocers or jobbers, but also to some large chain stores and institutions. It operates through various regional offices; the "regions" are subdivided into "districts," and the districts in turn are made up of what are known as "territories"; there are district offices and territorial offices. The Eastern Region, with headquarters in New York, includes the five districts of New York, Syracuse, Boston, Pittsburgh and Philadelphia. We are concerned here only with the Pittsburgh District, which covers counties in the western part of Pennsylvania, a large portion of Eastern Ohio, several counties in Maryland, and a part of West Virginia. It comprises the five territories of Pittsburgh, Cleveland, Youngstown, Clarksburg, and Altoona, the Pittsburgh Territory in turn embracing several counties around the metropolitan area. During the years in question plaintiff maintained a district office in Pittsburgh,[2] and the assessments made by the City and the School District were based on the sales allegedly made by that office.

Plaintiff conducted its business in the following manner: The regional office approved the selection of

---

[1] The question of what constitutes the *doing of business* is discussed in *New v. Robinson-Houchin Optical Co.*, 357 Pa. 47, 53 A. 2d 79.

[2] A territorial office was also maintained in Pittsburgh during at least a portion of the period.

certain jobbers in the various territories as customers, such jobbers becoming then the only wholesale grocers who were entitled to buy plaintiff's products. Such approval, of course, did not itself constitute the making of any sales but merely established the jobber as an approved customer. So-called "salesmen" were engaged in propaganda work throughout each of the territories, contacting local stores and drumming up business for the jobbers. They turned over the orders they thus obtained to the jobbers, who, from these orders and other information acquired by them, estimated what their needs would be for plaintiff's products for a certain period in the future and on that basis they in turn signed purchase orders to be submitted to plaintiff for acceptance. These jobbers' orders were gathered by the respective territorial managers and sent by them to the district office located, in this case, in Pittsburgh. That office, which is engaged in many functions or activities designed to further plaintiff's business, "processes" the orders, makes copies of them for files and for billing, accounting, and other purposes, and sends a copy to one of plaintiff's plants or distribution centers with directions for shipment to the customer; the plants are not located in Pennsylvania but there is a distribution center at Camp Hill. At the plant or warehouse the products ordered are then loaded on the cars of a common carrier in accordance with the shipping instructions.

Under the procedure thus outlined the question, then, presents itself: Where in the chain of these operations are the purchase orders accepted and the sales effected that result in the jobbers,—plaintiff's customers,—obtaining from it the products which they ordered? Certainly not in the territory by the territorial manager, for he merely solicits and gathers the orders and transmits them to the district office; there

is nothing to indicate that he has any authority to pass on the orders by way of accepting or rejecting them. In the course of the testimony given by the manager of the Pittsburgh District he was asked the question: "Can you tell us when the order for your company's products is accepted by the company?" He answered: "We have a published policy in that respect that plainly states that the acceptance of an order is not complete until we have given it to a common carrier, made the shipment to the common carrier. Shipment, in other words, is acceptance of an order." From this statement plaintiff argues that the acceptance of the order is made at the point of shipment of the merchandise, and, since that point is not within the Pittsburgh District, it would follow that plaintiff is not a vendor or dealer in Pittsburgh. It seems clear to us that this contention is wholly fallacious. It is true, of course, that title to the merchandise does not pass until the goods are placed in the cars of the common carrier for shipment, but the sales are effected when the customers' orders are accepted by plaintiff, and that occurs through the agency of its district managers. The employes at the plants or warehouses who execute the shipping instructions by performing the mechanical labor of loading the cars certainly have no authority or discretionary power to accept or reject orders. When the district office, after receiving an order, which is an offer to purchase, gives instructions to the plant or distribution center to make shipment to the customer, that action constitutes the acceptance of the order and the consummation of the sale. The district office thereupon registers the sale and bills the customer accordingly. Only the district manager would have the power to order or withhold a shipment, and, while it may be that orders normally pass through his office without challenge and its approval is more or less perfunctory

or ordinarily taken for granted, nevertheless it is his office which, by directing shipment, accepts the order and converts it into a sale. All that can be meant by the statement that acceptance of the order is not complete until shipment is made is that shipping instructions may be recalled even down to the time when transportation actually begins, but the place from which shipment is made cannot determine the situs of the sale. We therefore have no difficulty in arriving at the conclusion that plaintiff was a wholesale vendor of its products in the City and School District of Pittsburgh and therefore subject to the taxes here in question.

It is not clear from the record whether a proper allowance from the amount of the assessments was made by the City and School District for goods sold by plaintiff from the Pittsburgh District office to customers in other States. As far as sales were made to jobbers in Pennsylvania no problem arises with regard to the question of interstate commerce, whether or not the goods were shipped from outside the State to the Pennsylvania jobbers in pursuance of the sale: *Keystone Metal Co. v. Pittsburgh,* 374 Pa. 323, 97 A. 2d 797; *Wieman & Ward Co. v. Pittsburgh,* 381 Pa. 535, 113 A. 2d 719; *Norton Co. v. Department of Revenue of Illinois,* 340 U. S. 534. But in the case of purchase orders received from jobbers in other States and filled by shipments from either within or without Pennsylvania, such sales are exempt from these taxes, which must therefore be apportioned between the intrastate and interstate sales and liability imposed only for the former. The fact that a portion of the receipts of a business is derived from interstate transactions does not preclude assessment and collection of a local tax on its intrastate activities: *O. H. Martin Co. v. Sharpsburg Borough,* 376 Pa. 242, 102 A. 2d 125. If, there-

fore, such apportionment has not already been made proper credit should be allowed plaintiff accordingly.

A question is raised in regard to the products which plaintiff manufactures. It appears from the record that manufactured articles were exempted by the taxing authorities if the shipments to the customers were made from the place of manufacture, but they were included in the City tax in the case of shipments from the Camp Hill warehouse. That inclusion was error. The Act of June 25, 1947, P. L. 1145, as amended by the Act of May 9, 1949, P. L. 898, forbids the taxation by the political subdivisions of any privilege, act or transaction relating to the business of manufacturing, and accordingly it was held in *Isaly Dairy Co. v. Pittsburgh,* 379 Pa. 108, 108 A. 2d 728, that the City could not tax sales of articles manufactured by the taxpayer even if *sold* in locations apart from the place of manufacture; the same ruling necessarily applies to manufactured goods *shipped* from such other locations. Nor is there anything in the language of the statutory exemption to indicate that it could be restricted by the municipality to *local* manufacturers. As far as the School District tax is concerned, the Act of June 20, 1947, P. L. 745, provides, in likewise general language, that the term "dealer in" or "vendor of goods, wares and merchandise" should not include any person vending or disposing of articles of his own manufacture.

As to both the City and the School District plaintiff is therefore entitled to exemption on all the products manufactured by it, wherever sold or from whatever point shipped. But its contention that such exemption should be applied to decaffeinated and instant coffee, tapioca, and certain canned products, must be rejected. None of those articles is a manufactured product, not having gone through a substantial transformation in form, qualities, and adaptability in use

from the original material so that a new article or creation has emerged: *Commonwealth v. Weiland Packing Co.,* 292 Pa. 447, 141 A. 148; *Rieck-McJunkin Dairy Co. v. Pittsburgh School District,* 362 Pa. 13, 66 A. 2d 295; *Armour & Co. v. Pittsburgh,* 363 Pa. 109, 69 A. 2d 405.[3] Nor can we support plaintiff's further contention that those articles, if not manufactured, were at least processed and should therefore be exempted because the Act of May 9, 1949, P. L. 898, forbids the taxation of any privilege, act or transaction related to the business, not only of manufacturing, but also of "processing of . . . natural resources, or farm products, by manufacturers, by producers and by farmers with respect to the goods, articles and products of their own manufacture, production or growth." With respect to the articles in question plaintiff is neither a manufacturer nor a producer nor a farmer: see *Rieck-McJunkin Dairy Co. v. Pittsburgh School District,* 362 Pa. 13, 16, 17, 66 A. 2d 295, 296, 297.

Plaintiff contests the imposition of the interest and penalties which are included in the assessments, but that question was decided adversely to its contention in *Graybar Electric Company, Inc. v. Pittsburgh School District,* 378 Pa. 294, 106 A. 2d 413, and *Hughes v. Pittsburgh,* 379 Pa. 145, 108 A. 2d 698; see also *Keystone Metal Company v. Pittsburgh,* 374 Pa. 323, 332, 333, 97 A. 2d 797, 801, 802. Citing *Brown & Zortman Machinery Co. v. Pittsburgh,* 375 Pa. 250, 100 A. 2d 98, plaintiff pleads special circumstances as justifying its claim for such exemption; in that case, however, the failure to pay the proper amount of the

---

[3] Plaintiff cites several cases in other States apparently holding that canning is manufacturing even where designed merely to preserve the article for a longer life. But those decisions resulted from the application of a different standard to determine what is manufacturing than that which has been adopted in Pennsylvania.

tax resulted from the fault, not of the taxpayer, but of the taxing authority, whereas here the City and the School District correctly insisted from the beginning that plaintiff was liable for the taxes and tried for several years to get it to file returns and produce its records.

The orders of the court below are reversed, and the record is remanded for the purpose of determining the amount of the taxes due by plaintiff to the City of Pittsburgh and the School District of Pittsburgh for the years 1948-1953 in accordance with this opinion and entering judgments for the amounts so determined.