Rath Packing Company, Appellant, *v.* Pittsburgh.
Rath Packing Company, Appellant, *v.* Pittsburgh
School District.

Argued March 22, 1961.   Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

reargument refused June 15, 1961.

*Carl E. Glock, Jr.,* with him *Reed, Smith, Shaw & McClay,* for appellant.

*Edmund W. Ridall, Jr.,* Assistant Solicitor, with him *Niles Anderson,* Solicitor, for School District of Pittsburgh and Treasurer, appellees.

*Regis C. Nairn,* Assistant Solicitor, with him *David Stahl,* Solicitor, for City of Pittsburgh and Treasurer, appellees.

OPINION BY MR. JUSTICE BOK, May 2, 1961:

There are four appeals here from the action of the County Court of Allegheny County. They involve the same mercantile license tax levied under the same Acts of Assembly as in *Standard Brands v. Pittsburgh* and *Standard Brands v. Pittsburgh School District,* 403 Pa. 590 (1961), 170 A. 2d 568. One brace of appeals covers taxes on sales made during the years 1948 through 1954 and the other covers similar taxes during the year 1955.

From the assessments the taxpayer appealed to the County Court, which dismissed them and upheld the taxes. The taxpayer then appealed here.

The same legal principles and authorities are involved as in the *Standard Brands* case, and the tax is good if the evidence reveals more than mere solicitation of orders, as it clearly does. The taxes in question are limited to those laid on sales made in western Pennsylvania alone and the taxpayer admits the taxability of sales made and delivered in Pittsburgh, which were largely rejected orders where the goods had to be stored in the city or were otherwise housed there pending resale.

This mise-en-scene includes a main office at Waterloo, Iowa, and a district office in Pittsburgh. Every effort was obviously made to keep the latter a mere communication point and thus avoid the tax, but the exigencies of the business—which is meat packing and selling—couldn't be contained and unavoidably spilled

over. The company did its best to make every order subject to confirmation, per telephone or teletype, by the Waterloo office, but the court below did not think so, nor do we.

It is needless to labor all of the facts, as the case can be solved by examining the company's policy with regard to prices, credit, and payment.

In the case of prices, the Iowa office telephoned the current prices to the Pittsburgh office one or more times daily and the girls there relayed them to the salesmen on their routes. The court below found, and it is sustained by the evidence, that if a salesman approached a customer and got an order he could bind the company unless the customer's offer was below the price instructions from headquarters. But if the price of the order was within the limits already given the court found that the salesman could bind his principal to deliver the full amount. The court said: "The routine notice at the bottom of an order blank that the order must be confirmed (Tr. 22), does not speak as loudly as the deeds and practices engaged in by the local salesmen with obvious authority to accept the order, to fix the price and quantity with a possibility that the last mentioned may not all be sent at one time."

If later it was found that the particular item was in short supply the order was "shorted or pro-rated" and the customer could "back-order": this meant that he could and the company was obliged to deliver the deficit at a later date at the original price.

The subject is set at rest by the testimony of Lowe, the company's manager of car-route sales: "Q. All right, if a salesman is working with the current list price— let's say he received a price on the morning he makes a sale. Can he commit the company on that price? Will the company live up to that price? A. Yes. . . . Q. The salesman can, in effect, bind the company on prices? A. On prices. . . . Q. Can he tell the customer the

price is satisfactory without having approval from Waterloo? A. He can if he holds to the price list he has at that time."

The credit arrangement was that every one of the taxpayer's customers had an approved credit limit and that each salesman was supplied with a credit list of his accounts. If the purpose were merely to save the salesman's time, a list would be enough, but Lowe testified: "The salesman knows the limit of every account he has." This, as the court below observed, "is entirely consistent with an approach which vests in such salesmen the authority to bind their employer." The inference is strong and appropriate that the salesmen were thus authorized.

In the matter of payment, the company kept a Pittsburgh bank account into which were put the payments often made by check by the customers. One of them testified: "We mail the check to Rath Packing Company—their local office." Another, speaking of the company's salesmen, said: "Q. Is there any occasion when their salesmen come around and pick up the check? A. I can't remember of any . . . They usually want you to mail the check in. They have left stamped envelopes, with their name and the address on Washington Road, to mail the check in. Q. And that envelope has the local address on it? A. That is right."

While there is evidence that this bank account might not be used except to transmit such payments to Waterloo, it was clearly used to that extent.

From the whole record we are satisfied that the Pittsburgh office was more than a communication center and was used for more than solicitation only. Hence the company was a "vendor or dealer in goods, wares and merchandise", and the business processed through the Pittsburgh office during the years in question was taxable: *Albright & Friel, Inc. v. Philadelphia School District*, 187 Pa. Superior Ct. 387 (1958), 144 A. 2d

745; *General Foods Corp. v. Pittsburgh,* 383 Pa. 244 (1955), 118 A. 2d 572.

Appellant argues that the Commerce Clause of the Federal Constitution, Art. I, §8, Clause 3, forbids the tax here involved. A direct State tax on interstate commerce would of course be invalid, but while a complex commercial transaction may be one in interstate commerce when viewed as a whole, it may contain certain "intrastate events" or local activities which may be impressed legally with a State tax: *Wieman & Ward Co. v. Pittsburgh,* 381 Pa. 535 (1955), 113 A. 2d 719; *Keystone Metal Co. v. Pittsburgh,* 374 Pa. 323 (1953), 97 A. 2d 797, and the United States Supreme Court cases cited there, at page 327. The mercantile license tax is not laid upon a completed piece of business, but only on so much of it as, occurring locally, is more than solicitation and constitutes one a vendor or dealer. Here the effecting of the order, in the *General Foods* sense, is the taxable event, and no more is needed to make it taxable, since not every step in a transaction need take place in the taxing district: *Glendale Heights Ownership Assn. v. Glenolden Borough School District,* 393 Pa. 485 (1958), 143 A. 2d 386.

The orders are affirmed at the cost of appellant.

Mr. Justice BELL dissents.