Commonwealth *v.* Deitch Company, Appellant.

Argued May 23, 1972. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

reargument refused November 9, 1972.

*Melvin Schwartz,* with him *Cooper, Schwartz, Diamond & Reich,* for appellant.

*Edward T. Baker,* Deputy Attorney General, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, October 4, 1972:

The principal narrow issue for decision in this case is whether the operations of a scrap metal dealer come within the manufacturing exemption of the Capital Stock Tax Act of June 1, 1889, P. L. 420, as amended, 72 P.S. §1871. Although the manufacturing exemption has generated a substantial amount of litigation over the years, the case is a novel one in that we have never passed on whether scrap metal dealers are within the exemption's compass.

During the calendar year in question, the Capital Stock Tax Act, supra, imposed on domestic corporations a tax at the rate of five mills upon each dollar of the actual value of its whole capital stock. The act contains a proviso that the tax shall not apply to the capital stock of corporations ". . . organized for manufacturing, processing, research or development pur-

poses, which is invested in and actually and exclusively employed in carrying on manufacturing, processing, research or development within the State . . . but every corporation . . . shall pay the State tax . . . upon such proportion of its capital stock, if any, as may be invested in any property or business not strictly incident or appurtenant to the manufacturing, processing, research or development business . . . it being the object of this proviso to relieve from state taxation only so much of the capital stock as is invested purely in the manufacturing, processing, research or development plant and business."[1]

The dispute arose from the Department of Revenue's refusal to grant appellant's claimed manufacturing exemption of $5,250 in its capital stock tax return for the tax year which terminated December 31, 1959. An appropriate administrative appeal was taken to the Board of Finance and Revenue which sustained the disallowance of the exemption.[2] Appellant then filed an appeal on March 17, 1964, in the Court of Common Pleas of Dauphin County at No. 167 Commonwealth

---

[1] The act in effect in 1959, the disputed tax year, provided only that the tax should not apply to the capital stock of corporations organized for and engaged in carrying on "manufacturing." The processing exemption was added in 1961 and made retroactive to 1958. Twelve activities were specifically defined as processing. These ran the gamut from the cooking and freezing of fruits, meats and vegetables for wholesale distribution to the processing of used lubricating oils. See Act of August 23, 1961, P. L. 1100. The processing of waste or scrap material was not included in the enumeration or in the subsequent amendment and so appellant proceeds, as it must, on the theory that it is a "manufacturer." The research and development exemption was added by the Act of August 13, 1963, P. L. 799.

[2] Adjudication of this case was delayed when the parties mutually agreed to continue the matter pending a final determination in this Court of *Commonwealth v. Sitkin's Junk Co.*, 412 Pa. 132, 194 A. 2d 199 (1963).

Docket, 1964. The parties agreed to try the issue non-jury which was done on February 9, 1966. On October 24, 1969, appellant filed a petition to reopen testimony in the matter, alleging that it desired to present additional expert testimony to substantiate its claim for the manufacturing exemption. This request was subsequently denied by the court. After the filing of briefs and oral argument thereon, the court denied the appeal and upheld the original decision of the Board of Finance and Revenue disallowing appellant's claimed exemption.

On October 26, 1971, a timely appeal was taken to the Commonwealth Court. However, by an order of that court dated November 22, 1971, the appeal was transferred to this Court pursuant to the Appellate Court Jurisdiction Act.[3]

The record discloses that appellant, The Deitch Company, is engaged in what might be termed the recycling of metal. Scrap or waste metal such as railroad locomotives, freight and passenger cars, automobiles, river barges, boilers and mill slag is purchased with the ultimate objective of putting the same in such a condition that the scrap can be sold to steel manufacturers.[4] Upon reception of the junk metal at its scrap yard in Sharpesburg, appellant separates out and discards all unwanted and unusable waste. The me-

---

[3] The appeal to the Court of Common Pleas of Dauphin County, filed in March of 1964, was taken before that court's jurisdiction as the Commonwealth Court was assumed by the new Commonwealth Court. However, the final order of the lower court in this matter was not issued until October 7, 1971.

The present appeal is taken pursuant to Section 203 of the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P. L. 673, art. II, §203, 17 P.S. §211.203 (Supp. 1972).

[4] Deitch cleans, cuts and sorts out the various kinds of scrap metal. It is then sold to steel mills who use it for remelting purposes in blast or electric furnaces.

tallic scrap remaining is then sorted, graded, classified and segregated into various units. At one stage of the process much of the metal is either broken, cut, pressed, sheared or baled into proper sizes through the use of such machinery as mechanical shears, hydraulic presses and acetylene torches. The trial judge found as a fact that in this business there was no addition of materials to the metal. Undeniably, the mixed, unsorted scrap as purchased has little, if any, commercial value; after handling and preparation by the taxpayer such scrap becomes an article highly useful in the production of steel.

In addition to the exemption question we are asked to decide whether the lower court abused its discretion in refusing to permit appellant to reopen the record for the purpose of introducing additional testimony.

The element of difficulty in this and other cases dealing with the Capital Stock Tax manufacturing exemption arises from the absence of any statutory definition of the term "manufacturing."[5]

This definitional vacuum has been filled by a judicial definition of the term which has emerged from a long line of cases extending back over a hundred years' time. Our study of these cases and analysis of the challenged operation compels the conclusion that appellant's business activities do not constitute manufacturing as it has been defined by decisional law.

The most venerable statement of the definition is found in the oft-cited case of *Norris Brothers v. The*

---

[5] The capital stock tax is one of a series of state and local tax laws which contains an exemption for "manufacturing." Cf., "The Local Tax Enabling Act," 53 P.S. §6902. These laws were enacted without an accompanying definition of that term and thus the task fell to the courts to supply the definition. The sales tax also has a manufacturing exclusion but the legislature in that instance saw fit to supply the needed definition.

*Commonwealth,* 27 Pa. 494, 496 (1856) where it was successfully urged that the construction of locomotive engines, notwithstanding the fact that certain parts were supplied by others, entitled appellant to the manufacturing exemption. There the Court said: "But what is manufacturing? It is making. To *make* in the mechanical sense does not signify to create out of nothing; for that surpasses all human power. It does not often mean the production of a new article out of materials entirely raw. It generally consists in giving new shapes, new qualities, or new combinations to matter which has already gone through some other artificial process."

A more recent interpretation of the terms is found in *Commonwealth v. Berlo Vending Company,* 415 Pa. 101, 104, 202 A. 2d 94 (1964) where it was decided that the production of popcorn did not constitute manufacturing. There Mr. Justice ROBERTS, writing for the Court, stated:

"The meaning of 'manufacturing' has been restated by this Court in Philadelphia School District v. Parent Metal Products, Inc., 402 Pa. 361, 364, 167 A. 2d 257, 258-59 (1961); ' "Manufacturing" as used in a legislative enactment is given its ordinary and general meaning. It consists in the application of labor or skill to material whereby the original article is changed into a new, different and useful article: Commonwealth v. Weiland Packing Company, 292 Pa. 447, 449, 141 Atl. 148 (1928); Pittsburgh v. Electric Welding Company, 394 Pa. 60, 145 A. 2d 528 (1958). Whether or not an article is a manufactured product depends upon whether or not it has gone through a substantial transformation in form, qualities and adaptability in use from the original material, so that a new article or creation has emerged: General Foods Corp. v. Pittsburgh, 383 Pa. 244, 118 A. 2d 572 (1955). If there is

merely a superficial change in the original materials, without any substantial and well signalized transformation in form, qualities and adaptability in use, it is not a new article or new production: Commonwealth v. Weiland, supra; Pittsburgh v. Electric Welding Co., supra.'

"On the same day as the decision in Parent Metal Products Co., we also decided Philadelphia School District v. Rosenberg, 402 Pa. 365, 368, 167 A. 2d 259-260 (1961), in which we emphasized that 'it is the popular or practical understanding of what is "manufacturing" that prevails and is intended.' "

Concededly, "it is sometimes difficult to determine with legal exactness what is and what is not manufacturing", *Commonwealth v. McGrady-Rodgers Co.*, 316 Pa. 155, 158, 174 A. 395 (1934), for as one court has observed, "[i]t is easier to feel the line of distinction than to express it . . . ." *Philadelphia School District v. Mutual Trimming Co.,* 14 Pa. D. & C. 2d 207, 209 (1957).

Possibly the most readily discernible aspect of this exemption is the legislative purpose sought to be achieved. It was created in order to establish a favorable climate in Pennsylvania for manufacturers and thus encourage the development of industry. Additionally, there was a desire not to put domestic manufacturers at a competitive disadvantage with out-of-state industries. See Hoffman, Taxation, 25 U. Pitt. L. Rev. 177, 178 (1963), and *Pillsbury Mills, Inc. v. Pittsburgh School District,* 408 Pa. 369, 184 A. 2d 236 (1962).[6]

_____
[6] As this Court explained in *Commonwealth v. Northern Electric Light and Power Co.*, 145 Pa. 105, 120, 22 A. 839, 841 (1891): "When the Act of 1885 [exempting manufacturers from the capital stock tax] was passed, laws had been made in adjoining states which gave encouragement to the establishment of factories by exempting them from certain forms of taxation. The mischief to

Since the appellant and its property are within the general language of the act which imposes the capital stock tax, the provisions relied upon to establish the claimed exemptions must be strictly construed. *Commonwealth v. Berlo Vending Co.*, supra.

Appellant seeks to establish a clear right to the exemption by arguing that by the application of skill and labor it gives new shapes, qualities or combinations to the scrap metal which are adapted to use by steel mills. It calls the Court's attention to the fact that its product has distinctive names such as "No. 1 Heavy" and "Commercial Scrap" and contends that its product is new and distinctly different from the waste material upon which it originally begins its work. The original waste material, it is noted, cannot be utilized by a steel mill nor has it any commercial value in its raw state.

Counsel for appellant also asserts that the rationale of the Court in *Commonwealth v. Sitkin's Junk Co.*, 412 Pa. 132, 194 A. 2d 199 (1963), which took up the question of whether the scrap metal business constituted manufacturing under the Selective Sales and Use Tax of 1956, is applicable instantly.[7]

---

be remedied was the danger that such legislation might lead to the removal of capital and labor from this state to others, to the detriment of the business and prosperity of our own. The remedy provided was the removal of the tax [on capital stock] imposed by the Act of 1879, so as to remove the inducement to leave the state. It was . . . made applicable to the class which since 1836 it had been the policy of the state to encourage, viz., manufacturing corporations.' . . . that class of productive industries which the legislature had sought to encourage as a means of bringing and keeping within our borders capital and labor to be employed in the development of our mineral wealth, and in the production of the staples of commerce."

[7] The *Sitkin's* case involved the taxability under the sales and use tax* of machinery sold to and used by a scrap metal business. Unlike the situation obtaining in the corporate stock tax, the legislature expressly defined "manufacture" for sales tax purposes as follows:

The Commonwealth also utilizes the *Sitkin's* case but for the contrary proposition that scrap metal processing is *not* manufacturing in the historical common law sense of that term. Emphasized is the fact that the opinion was wholly bottomed on the *statutory* definition of manufacturing which is more inclusive than its common law counterpart, which was carefully distinguished and demonstrated as not controlling.[8]

(c) "Manufacture The performance of manufacturing, fabricating, compounding, processing or other operations, engaged in as a business, which place any personal property in a form, composition or character different from that in which it is acquired whether for sale or use by the manufacturer. . . ." 72 P.S. §3403-2(c).

The lower court, following the rationale of *Commonwealth v. Donovan Co.*, 76 Dauphin 191 (1960), held that this legislative definition intended only to *describe* the process of manufacturing and not to enlarge it beyond the judicial definition developed under prior statutes during the past century and hence found Sitkin's subject to the tax.

Our Court reversed on appeal holding that the legislative definition was not a mere restatement of the common law definition and consequently this new definition should have been applied by the lower court. Mr. Justice [now Chief Justice] JONES in his opinion for the Court said that the scrap metal "after and as a result of the handling and activities of the taxpayers, was in a 'form, composition and character' *different* from that scrap which had been acquired by the taxpayers." 412 Pa. at 141.

* Act of March 6, 1956, P. L. (1955) 1228, as amended, 72 P.S. §3403-1 et seq. The enactment is now entitled the "Tax Act of 1963 for Education." This act (§2(j) 72 P.S. §3403-2) in defining a "Sale at Retail" of tangible personal property upon which the tax is imposed under §201(a), specifically *excludes* a transfer of tangible personal property either for the purpose of resale or of "machinery and equipment . . . to be used . . . in any of the operations of—(a) The *manufacture* of personal property . . . ." (Emphasis supplied.)

[8] "By specifically defining 'manufacture' the legislature indicated its intent that 'manufacture' be construed in accordance with the statutory language and that the construction of such word was not to be controlled by prior judicial construction of such word under prior tax statutes. By way of example, the Act provides that

Our comprehension of *Sitkin's* case is in substantial accord with that of the Commonwealth. Clearly, the historical definition of "manufacture" was read out of the sales tax as inapplicable. Our opinion in *Sitkin's* also gave a lucid indication that the two definitions differed in the respect that the sales tax definition was a much more inclusive term.[9]

While it is an oversimplification, appellant does begin and end with scrap or junk metal. It adds nothing to the mass as it arrives at the Sharpesburg yard, but rather subtracts by cleaning away unwanted elements. It grades and classifies the material lest it send the wrong kind of metal to its customers, the steel mills. The metal is cut or pressed down to a smaller size because it has to fit through small furnace doors and bulky pieces will not do. While the compression of old automobiles into blocks of steel might strike one less sophisticated in the arcane concepts of taxation and legal interpretation as a substantial change, the legal reality is that the transformation is merely superficial since the steel contained therein remains totally unchanged as a result of this activity.[10]

---

the finished product be *'different'* from that form in which it was acquired whereas under prior judicial construction the finished product had to be both 'new and different.'" 412 Pa. 138, 194 A. 2d at 202.

[9] The opinion rejected any notion that the taxpayers "fabricated," "compounded" or "processed" the scrap. Instead it held that their activities fell into the *other operations* category of manufacturing. *Other operations* was said to include and embrace other types of activities not covered by the words "manufacturing, fabricating, compounding and processing." See 412 Pa. at 139. There is *no* comparable provision in the language of the Capital Stock Tax Act.

[10] The record indicates that the preparation of old automobiles for compression into blocks of steel is not as complex as the dissent seems to indicate. The company president, Aleon Deitch, testified that when junk autos are received, the engine block is re-

To paraphrase an observation of the late Mr. Justice Bok made in a slightly different context, the scrap metal has been subjected to a process which brought it forward to a particular kind of usefulness in the final product. But the process was more a rearrangement than a manufacture.[11]

The decisions in *Philadelphia School District v. American Leonic Manufacturing Co.*, 205 Pa. Superior Ct. 243, 209 A. 2d 5 (1965), and *Pittsburgh v. Electric Welding Co.*, 394 Pa. 60, 145 A. 2d 528 (1958) provide, in our view, useful analogies to the instant case and are instructive as to a proper determination.

*American Leonic* involved the production of "specialty wire". The taxpayer purchased, etc. . . . The taxpayer purchased rods of heavy wire which were then drawn through dies in order to convert them into thinner wire. The wire was then cleaned and sometimes treated by intense heat (annealed), in order to meet the specifications of the customer. The court found that the only change made was in the size of the wire and held the company was not a manufacturer. Just as the large rods of wire would be of no use to one who needed thinner specialty wire, large chunks of scrap metal will not serve the purposes of the steel mills. Reduction in size however is not what is meant in case law by "substantial transformation."

In *Pittsburgh v. Electric Welding Co.*, supra, the company purchased steel rods of various sizes from producers, cut them to desired lengths and then bent or twisted them to suit the specific reinforcing purposes

---

moved and the auto is then set on fire to burn away unwanted elements. The remainder is hand stripped of any copper and then crushed to a smaller size.

[11] Mr. Justice Bok's observation was made while sitting as a trial judge in the case of *Philadelphia School District v. Mutual Trimming Co.*, 14 Pa. D. & C. 2d 207, 209 (1957), where the question was whether the cutting and shaping of cloth was manufacturing.

of its clientele, construction contractors. It was held that the operations of Electric Welding did not result in any well signalized or substantial transformation in the form or quality of the steel materials bought from producers and resold with a twist or a bend to its customers. Such changes were termed "purely superficial."

Herein appellant also subjects the material which it buys to certain manipulations which amount to a change in shape and a reduction in size, but are not such as to properly constitute it a manufacturing corporation.

Several other aspects of this case also merit comment. Appellant directs our attention to the fact that his operation involves an extensive plant, numerous highly skilled processes and some rather intricate machinery.

The application of labor to materials and the sophisticated nature of the operation are factors to be considered but are not in themselves determinative of whether a corporation is engaged in manufacturing in a legal sense. As the opinion of the Court in *Armour & Co. v. Pittsburgh,* 363 Pa. 109, 116, 69 A. 2d 405 (1949) observed: "Nor is it of legal significance in this connection that the operations thus conducted require large and extensive plants and organizations, trained men and intricate machinery, for even though the labor be skilled, the operations delicate, a large plant involved, and expensive machinery utilized, such factors, neither individually nor collectively, convert what is essentially a mere processing operation into a manufacturing one: cf. Rieck-McJunkin Dairy Co. v. Pittsburgh School District, 362 Pa. 13, 23, 66 A. 2d 295, 299."

Appellant also notes that cases from many of the surrounding states hold scrap metal operations to be

manufacturing activity.[12]    See Annotation, 17 ALR 3d 7.   This argument is more appropriately addressed to the legislative branch which has from time to time amended this statute to embrace additional kinds of industrial activities.

Lastly, it is argued that if steel mills performed the same operations on their own scrap as the instant taxpayer does, they would be exempted from the tax as manufacturers.   But it does not of necessity follow that appellant is entitled to the same consideration, for as the court said in *Hazen Engineering Co. v. Pittsburgh*, 189 Pa. Superior Ct. 531, 540-41, 151 A. 2d 855 (1959) : "Doing the same thing by different people under different circumstances has been held to be manufacturing in one case and not manufacturing in the other."

The second assignment of error is that the lower court abused its discretion in not permitting appellant to reopen the record for the purpose of offering additional evidence which would have demonstrated eligibility for the manufacturing exemption.   Four years after the trial appellant sought to present additional expert evidence in the field of metallurgy which allegedly would have disclosed that its activities caused molecular changes upon the scrap and waste metal, resulting in the production of a new and different product.

The general rule is that a court may, in its discretion, reopen the case after a party has closed for the taking of additional testimony, but such matters are

---

[12] Appellant overlooks the fact that the language of the taxing statutes of sister states often differs in important particulars from that in the capital stock tax act.  Thus, for example, in *Middletown Iron & Steel Co. v. Evatt*, 139 Ohio State 113, 38 N.E. 2d 585 (1941), where it was held that the processing of scrap according to specification was an integrated step in the manufacture of steel, the statute there exempted from tax articles "*manufactured or changed in any way.*"

peculiarly within the sound discretion of the trial court, and a denial of the opportunity for a rehearing for the purpose of introducing additional evidence will not ordinarily be disturbed. 38 P.L.E. Trials §413.

In our view, even a molecular change does not radically alter the nature of the final product here or the fact that appellant is essentially engaged in a processing operation. See *Commonwealth v. Lowry-Rodgers Co.*, 279 Pa. 361, 123 A. 855 (1924), where the roasting of coffee beans was held not to be manufacturing despite the fact that a chemical change in the beans was effected by the roasting process.

Judgment affirmed.

Mr. Chief Justice JONES dissented.

————

DISSENTING OPINION BY MR. JUSTICE O'BRIEN:

I respectfully dissent from the conclusion reached by the majority. In my view, appellant is engaged in a manufacturing operation, and I would resolve the anomaly created by the existence of *Commonwealth v. Sitkin's Junk Co.*, 412 Pa. 132, 194 A. 2d 199 (1963), by following the rationale of that case.

While manufacturing may not occur when reinforcing rods are bent to meet shapes specified by a customer, that example is a far cry from the procedures followed by appellant in preparing scrap materials for the market. A worn out automobile is nothing more than a worn out automobile prior to appellant's preparation of it for recycling. There is much more involved than simply compressing the automobile into a bale which will fit the opening of an open hearth or electric furnace. For example, the engine, transmission, rear end, and other drive line components must be removed. The frame must be cut away from the body. All nonferrous materials, glass and upholstery must be removed. What remains is the automobile body, which is hydraulically

compressed. The other components are also treated and cut up into various sizes for various purposes. The engine block itself does not become cast iron scrap suitable for foundry use until the pistons and connecting rods are removed, etc.

I believe it is a gross oversimplification to characterize appellant's operation as mere processing and not manufacturing. The example given above is only one of the highly complex operations which occur in the scrap business, and I do not believe that the General Assembly's failure to define manufacturing in the Capital Stock Tax Act should operate to impose that tax on one who is clearly engaged in manufacturing, where the act contains an exemption for manufacturing.

The majority indicates that appellant is not a manufacturer because, among other reasons, "it adds nothing to the mass . . . , but rather subtracts by cleaning away unwanted elements." Surely a producer of newel posts, who purchases properly shaped and sized pieces of lumber and turns them on lathes to produce the finished product, adds nothing to the mass, but rather subtracts by removing unwanted wood. I have no doubt that such an operation would be considered manufacturing under the Capital Stock Tax or any other act.

The majority opinion concludes that the Legislature has illogically denied scrap dealers an exemption as "manufacturers" under the Capital Stock Tax while granting them the same exemption under the Sales and Use Tax. A much more reasonable conclusion would be that when the Legislature defined "manufacturing" in the Sales and Use Tax Act, it intended that definition to control for all legislative purposes. After all, the definition in the Sales and Use Tax: "(c) 'Manufacture.' The performance of manufacturing, fabricating, compounding, processing or other operations, engaged in as a business, *which place any personal prop-*

*erty in a form, composition or character different from that in which it is acquired whether for sale or use by the manufacturer. . . .*" (Emphasis supplied.) is very similar to the judicial definition in *Norris Brothers v. The Commonwealth,* 27 Pa. 494, 496 (1856), cited by the majority: "But what is manufacturing?   It is *making.*   To *make* in the mechanical sense does not signify to create out of nothing; for that surpasses all human power.   It does not often mean the production of a new article out of materials entirely raw.   *It generally consists in giving new shapes, new qualities, or new combinations to matter which has already gone through some other artificial process.*" (Emphasis supplied)

The activities of appellant clearly convert useless metal products into a very useful raw material.   As such, the appellant should be considered a manufacturer and entitled to the exemption.