508 A.2d 1298

Harsco Corporation, Appellant *v.* City of Pittsburgh, Appellee.

Argued March 13, 1986, before Judges CRAIG and MACPHAIL, and Senior Judge BLATT, sitting as a panel of three.

*Kenneth K. Kilbert,* with him, *Frank T. Guadagnino, Reed, Smith, Shaw & McClay,* for appellant.

*Ronald H. Pferdehirt,* Assistant City Solicitor, with him, *D. R. Pellegrini,* City Solicitor, for appellee.

Opinion by Judge Craig, May 6, 1986:

The Harsco Corporation appeals an order of the Court of Common Pleas of Allegheny County, which dismissed Harsco's post-trial motion and directed entry of judgment in favor of the City of Pittsburgh. Trial Judge Silvestri held that Harsco was not entitled to a tax refund[1] because the business activity in which Harsco engages—the removal of iron from raw slag—does not constitute "manufacturing," and Harsco is therefore subject to the Business Privilege Tax of the City of Pittsburgh[2] consistent with section 2(4) of the Local Tax Enabling Act.[3]

Pertinent to this appeal, the Local Tax Enabling Act provides:

Such local authorities shall not have authority by virtue of this act:

(4) To levy, assess and collect a tax on *goods and articles manufactured in such political subdivision or on the by-products of manufacture,* or on minerals, timber, natural resources and farm products produced in such political subdivision or on the preparation or processing thereof for

---

[1] Section 1 of the Act of May 21, 1943, P.L. 349, *as amended,* 72 P.S. §5566b, requires that a political subdivision make refund of taxes paid by a person or corporation of the Commonwealth to which the political subdivision is not legally entitled. Where, upon the filing of a written and verified claim, the political subdivision fails to make such tax refund, section 2 of that act, 72 P.S. §5566c, provides that the aggrieved person or corporation shall have the right to bring suit for and recover any such taxes by instituting an action in assumpsit in the court of common pleas. This appeal is from that assumpsit suit brought by Harsco.

[2] Article VII, Chapter 243.02 of the Pittsburgh Code provides: Every person engaging in any business in the city shall pay an annual tax at the rate of six mills on each dollar of volume of the gross annual receipts thereof.

[3] Act of December 31, 1965, P.L. 1257, *as amended,* 53 P.S. §6902(4).

use or market, or on any privilege, act or transaction related to the business of manufacturing, the production, preparation or processing of minerals, timber and natural resources, or farm products, *by manufacturers,* by producers and by farmers *with respect to the goods, articles and products of their own manufacture,* production or growth, or on any privilege, act or transaction relating to the business of processing by-products of manufacture, or on the transportation, loading, unloading or dumping or storage of such goods, articles, products or by-products;

. . . .

53 P.S. §6902(4) (emphasis added).

Because the legislature has not statutorily defined "manufacturing," that term has been judicially defined. In *Norris Brothers v. Commonwealth,* 27 Pa. 494, 496 (1856), the Supreme Court first announced that:

[Manufacturing] does not often mean the production of a new article out of materials entirely raw. It generally consists in giving new shapes, new qualities, or new combinations to matter which has already gone through some other artificial process.

Recently, in *Bindex Corporation v. City of Pittsburgh,* 504 Pa. 584, 587-88, 475 A.2d 1320, 1322 (1984), the court stated:

[T]he concept underlying the definition is the transformation of material or things into something different from that received. The difference cannot be a superficial change that does not alter or change the thing. . . . What is required is that the basic materials or goods be given a new identity by the current producer, one which can be easily traced to such producer. This identity must be the product of skill and

labor. Skill involves education, learning, experience or knowledge one acquires in a particular business, trade or profession; while labor is the physical characteristics and methods utilized to employ one's skills. When labor is used in conjunction with skill to produce a different product than the original, one with a new identity, manufacturing has occurred.

Harsco terms its process a "metal recovery operation"; from slag, a by-product of the steelmaking process,[4] Harsco produces "metallics" which are high iron-content pieces of metal. Steelmakers use iron ore and pieces of metal with high iron content as primary sources of iron, necessary ingredients in the making of steel. During steelmaking in an electric arc furnace, the various ingredients are heated in the furnace, causing the impurities present to rise to the top, forming slag, while the heavier molten steel settles to the bottom. The steelmaker removes the molten steel for further processing and typically relinquishes the slag for baser uses such as landfill.

Harsco begins its process by transporting the molten slag in large pots from the steelmaker's plant to Harsco's plant one-half mile away. At Harsco's facility, workers pour the molten slag into a large pit, spreading it in a thin layer, and then spray it with water in order to control the cooling of the slag. This technique causes fissuring, resulting in pieces of slag whose thinness facilitates the separation of the iron from the impurities.

---

[4] Dr. George R. St. Pierre, a professor of Metallurgical Engineering, testified:

Q. Is it possible under current technology to make steel without the formation of slag?

A. No. No, sir.

Q. It is a necessary waste product?

A. It is necessary—troublesome but necessary waste product I guess is the best way I can describe it.

Once cooled, front-end loaders load the thin pieces of slag into a "grizzly," which screens out pieces of slag larger than eight inches in length. A conveyor belt next takes the pieces that are smaller than eight inches into a rotating magnetic separation drum which separates the metallic slag from the waste slag. A series of screens sorts the metallics according to size. Finally, Harsco resells the various-sized pieces of metal to a steelmaker, who uses them in its furnaces in the steelmaking process. Although raw slag is considered a waste product by the steelmaker, the steelmaker pays Harsco at least $35 per ton for the iron-rich metallics.

## Skill and Labor

The record convinces us that Harsco's production of metallics involves the requisite skill and labor usually associated with manufacturing. The formulation of the iron recovery process and the design and construction of the instrumentalities of that process required a great deal of skill. Harsco points out that it designed the huge pots in which the molten slag is initially collected, as well as the large rubber-tired vehicle which transports the pots from the steelmaker's plant to Harsco's facility. Both the pit which receives the molten slag, and the water spray cooling technique were the manifestation of Harsco's efforts to facilitate the cooling of the molten slag in thin layers.

In addition to the skill required to develop the processes and instrumentalities of metallics production, the description of the process also makes clear, as the trial court concluded, that the production of metallics requires a substantial labor effort.

## New Identity

However, in ultimately concluding that Harsco's operation was not manufacturing, Judge SILVESTRI of the trial court stated:

[T]here is lacking a new identity to the iron in the slag. While the slag contains iron and compounds of iron, the free iron and the iron freed from the compounds are separated from the slag. Iron, the end product extracted from the slag has not gone through a substantial transformation in form, qualities and adaptability in use as it existed in the molten slag. There is free iron in the molten slag and the free iron is the same when removed from the slag. In addition to the foregoing, what Harsco does is not the popular or practical understanding of what manufacturing is.

Because we are unaware of any decision that has addressed whether the metallic-producing process is a manufacturing process, we turn for guidance to the cases which each side suggests are controlling.

Harsco contends that the metallic-producing process can be likened to oil refining, which the Supreme Court addressed in *Atlantic Refining Co. Appeal,* 398 Pa. 30, 156 A.2d 855 (1959). There, the court held that the oil refining process was manufacturing because "[t]here was ample evidence and findings of the court below that the appellee's factory creates hundreds of products in other materials and each product is new in physical and chemical qualities and also in their function and use, with the resultant difference in their commercial acceptance." 398 Pa. at 34, 156 A.2d at 857. The court also noted that in past cases it had referred to the refining of petroleum as a manufacturing process without directly addressing that issue, thus evidencing the common assumption that refining is a manufacturing process.

The metallic-producing process and the oil refining process both involve the separation and purification of the initial material into its component parts. However,

in *Atlantic Refining,* the court focused not on the process itself, but rather on the finished products, *e.g.,* gasoline, naptha, kerosene, motor oils, lubricating oils, fuel oils, waxes, detergents and greases, which resulted from additional changes after separation. By contrast, Harsco's process ends once it has separated the high iron-content metallics from the impurities in the slag.

In support of the position that Harsco's process is not manufacturing, the city relies upon *Commonwealth v. Deitch Company,* 449 Pa. 88, 295 A.2d 834 (1972), and the later cases[5] which stand for the proposition that the operations of a scrap metal dealer do not constitute manufacturing for the purposes of tax exemption.[6] The court stated:

> While it is an oversimplification, appellant does begin and end with scrap or junk metal. It adds nothing to the mass as it arrives at the Sharpesburg (sic) yard, but rather subtracts by cleaning away unwanted elements. It grades and classifies the material lest it send the wrong kind of metal to its customers, the steel mills. The metal is cut or pressed down to a smaller size because it has to fit through small furnace doors and bulky pieces will not do. While the compression of old automobiles into blocks of steel might strike one less sophisticated in the arcane concepts of taxation and legal interpretation as a substantial

---

[5] *See Morrisville Scrap Processing Co., Inc. Appeal,* 6 Pa. Commonwealth Ct. 121, *aff'd* 453 Pa. 610, 307 A.2d 905 (1973); *Riverside Iron and Steel Corp. v. Monongahela,* 7 Pa. Commonwealth Ct. 269, 298 A.2d 918 (1972).

[6] The Deitch Company sought a manufacturing exemption from the Capital Stock Tax Act, Act of June 1, 1889, P.L. 420, *formerly* 72 P.S. §1871, repealed by section 605 of the Tax Reform Act, Act of March 4, 1971, P.L. 6, 72 P.S. §7605. A similar act is now found in 72 P.S. §§7601-7605.

change, the legal reality is that the transformation is merely superficial since the steel contained therein remains totally unchanged as a result of this activity.

To paraphrase an observation of the late Mr. Justice Bok made in a slightly different context, the scrap metal has been subjected to a process which brought it forward to a particular kind of usefulness in the final product. But the process was more a rearrangement than a manufacture. 449 Pa. at 97-98, 295 A.2d at 839-40.

Initially, we cannot say that, like the scrap process, the iron contained within the slag remains totally unchanged as a result of Harsco's activity. The evidence indicates that slag contains iron in the forms of mixed iron and free iron and Harsco's process facilitates the conversion of mixed iron into free iron, thus increasing the yield of free iron and iron-rich metallics. However, this conversion is actually a complex way of further separating the pure iron from the impurities.[7] Therefore,

---

[7] Roger Hatch, a Harsco operations superintendent testified:

Q. Mr. Hatch, as a result of putting the slag through the [Harsco] process, is any steel or iron created which wasn't already there at the beginning of the process?

A. No sir.

Q. So it is already there, is that right?

A. Yes, sir.

Q. At any part of the process are any chemicals added to or incorporated into the slag?

A. No, sir.

Q. So the overall composition of the slag remains the same. If you put all the pieces at the end of the process together, essentially you would have the same thing that you had at the beginning?

A. You would have the same—right. You would have the same raw materials that we started with. They are not changed in chemical composition. Only in usable sizes.

although we acknowledge that Harsco's metal recovery operation is significantly more complex than the processing of scrap metal as outlined in *Deitch*,[8] "[t]he application of labor to materials and the sophisticated nature of the operation are factors to be considered but are not in themselves determinative of whether a corporation is engaged in manufacturing in a legal sense." *Deitch*, 449 Pa. at 99, 295 A.2d at 840.

Accordingly, we are unable to state that the separation process in which Harsco engages brings about a substantial transformation in the component parts of slag so as to create a new product as required to constitute manufacturing.

Further, we note that, in *Deitch*, the court noted that "it is the popular or practical understanding of what is 'manufacuring' that prevails and is intended." 449 Pa. at 94, 295 A.2d at 837 (quoting *Philadelphia School District v. Rosenberg*, 402 Pa. 365, 368, 167 A.2d 259-60 (1961)).

In that regard, we note that the resulting high iron-content metallics which Harsco produces are sold to a steelmaker who then melts them down, again creating molten steel and slag. That slag could again be carted away by Harsco for further subjection to the metallic-producing process. Hypothetically, Harsco could perform this process repeatedly on the same batch of slag despite the decreasing yield each time, because inevitable inefficiencies in the metallic-producing process prevent Harsco from producing metallics which are

---

[8] Relying upon the testimony of Deitch's president, the court summarized the processing of scrap metal as follows:

[W]hen junk autos are received, the engine block is removed and the auto is then set on fire to burn away unwanted elements. The remainder is hand stripped of any copper and then crushed to a smaller size.

*Deitch*, 449 Pa. at 97-98 n. 10, 295 A.2d at 839 n. 10.

100% pure iron, and similarly, the inefficiencies of the steelmaking process prevent the steelmaker from using 100% of the iron contained in the iron-rich raw materials which he melts down to produce molten steel.

Accordingly, to conclude that Harsco's metallic-producing operation constitutes "manufacturing," we would be required to acknowledge that Harsco could potentially "manufacture" the same iron metallics over and over again. Clearly the popular and practical under-standing of what is "manufacturing" does not include a product which can be "manufactured" over and over again using the exact same ingredients each time.

**By-Product of Manufacture and Processing of Minerals**

Harsco contends that, even if it is not engaged in manufacturing, it is exempt from taxation because it is (1) engaged in the processing of by-products of manufac-ture, and (2) engaged in production, preparation or processing of minerals. We believe that the trial court correctly disposed of this issue by relying upon *Crawford v. Southern Fulton School District*, 431 Pa. 324, 246 A.2d 332 (1968).

In *Crawford*, the court dissected subsection (4) of section 2 of the Local Tax Enabling Act, but in doing so, stated that the key to understanding that subsection requires a view of the exception as a whole. The court stated "[t]he legislature was attempting to make Penn-sylvania manufactured and farm products more compet-itive in the open market by prohibiting all taxes which would be included directly in the cost of the product." 431 Pa. at 330, 246 A.2d at 335. Therefore, the court concluded that the legislature, by setting forth five sep-arate activities which should be exempt from taxation under subsection (4), was indicating that those activities should be tax exempt only when they are conducted by manufacturers in relation to the manufacturing process.

Accordingly, because the legislature intended that the business of processing by-products of manufacture and the processing of minerals should be extended only to manufacturers themselves, Harsco, because it is not a manufacturer, is not entitled to tax exemption under these provisions.

The sound decision of Judge SILVESTRI is affirmed.

### ORDER

Now, May 6, 1986, the decision of the Court of Common Pleas of Allegheny County, dated April 29, 1985, No. GD 82-12576, is affirmed.