**Mary BRETZ, Appellant**

**v.**

**CENTRAL BUCKS SCHOOL DISTRICT.**

Commonwealth Court of Pennsylvania.

Argued Dec. 11, 2013.

Decided Feb. 21, 2014.

Martin J. King, New Hope, for appellant.

Sharon F. Harvey, Paoli, for appellee.

BEFORE: PELLEGRINI, President Judge, and McGINLEY, Judge, and LEADBETTER, Judge, and COHN JUBELIRER, Judge, and LEAVITT, Judge, and BROBSON, Judge, and McCULLOUGH, Judge.

OPINION BY Judge McCULLOUGH.

Mary Bretz (Landowner) appeals from the May 25, 2012 order of the Court of Common Pleas of Bucks County (trial court) denying her request for injunctive relief and entering judgment in favor of the Central Bucks School District (District). For the reasons that follow, we affirm in part, reverse in part, vacate in part, and remand to the trial court for a new decision.

Landowner purchased the 31–acre property (Property), historically designated Datestone Farm, in 1982, and she resides there with her husband and children. The Property is downstream from and adjacent to the District's 66–acre property containing the Central Bucks High School East and the Holicong Middle School. The District's property borders both Holicong and Anderson Roads.

In September 2001, Landowner filed a complaint in equity,[1] alleging that the expansion of the high school in 1997–98 and the expansion of the middle school in 1998–99, including the construction of a detention basin adjacent to the Property, caused an increase in the volume and duration of stormwater discharge onto the Property and resulted in long-term and continuous damage. Landowner averred that the continuing trespass carries away stone and soil, erodes land around and beneath trees, threatens septic fields and electrical transformers, and renders land wet and muddy, exceeding what would occur but for the artificial conditions created by the District. Asserting that she has no adequate remedy at law, Landowner seeks a decree that: enjoins the further trespass[2] by the increased duration and/or volume of stormwater discharge; requires the District to redesign and implement stormwater management in order to reduce stormwater discharge to conditions existing pre-con-

---

1. The District does not object to the form of the action. (Reproduced Record (R.R.) at 18a–21a.)

2. In *Marlowe v. Lehigh Township*, 64 Pa. Cmwlth. 587, 441 A.2d 497, 501 (1982), we held that a township's activities which caused the flow of water onto a property owner's land were clearly intentional and, therefore a trespass, citing section 162 of the Restatement (Second) of Torts (1965) (providing that one who trespasses is liable for physical harm to the possessor of the land and to the possessor's land also).

struction; and awards damages for trespass and expenses incurred for remediating the effects of the unlawful discharge onto Landowner's Property.

The trial court held a hearing on Landowner's complaint from April 26 to April 28, 2010. At that time, Landowner was appealing the District's planned projects for the construction of a high school stadium and science wing. Jeffrey Bretz, Landowner's husband, described the changes he observed on the Property following the high school and middle school expansions. He stated that initially, the Property had a natural, gentle, 60–foot swale below a District soccer field and an 8–inch discharge pipe buried in riprap on or abutting the property line. Bretz testified that the broad swale was reduced from 60 feet to 10 feet after the District's construction of a detention basin and installation of a 36–inch pipe. Bretz further testified that the District installed a berm around the detention basin that was 15–feet high, when evaluated from the base of the Property, and that the surface water collected inside the berm is approximately 5–feet high. According to Bretz, the detention basin, berm, and 36–inch pipe operated to decrease the rate of surface water flow onto the Property, but the duration of the flow was increased substantially (for example, from 1 day to 4 or 5 days); as a result, water accumulated in and extended to new areas of the Property, including a stand of trees. Bretz submitted photographs reflecting clay soil, downed trees, and areas of erosion caused by outfall from the discharge pipe, and he stated that trees on either side of that area do not suffer. (R.R. at 23a–42a.)

At the hearing, both parties presented expert testimony concerning the stormwater management undertaken during the District's construction. Much of the testimony concerned whether the District violated the applicable subdivision and land development ordinance (SALDO). The first relevant provision is section 9.23A(4) of the SALDO (emphasis added), which states:

> The developer shall construct and/or install stormwater management facilities, on- and off-site, as necessary to: Convey stormwater along or through the property to a natural outfall. *If a developer concentrates dispersed stormwater flow or* redirects stormwater flow to exit at another location on the property, the developer is responsible for constructing an adequate channel on the adjacent property and on all downstream properties until a natural outfall is reached.

Also, section 9.23B(2) of the SALDO (emphasis added) states in part:

> The *existing points and patterns of natural drainage discharge onto adjacent property shall not be altered* without the written approval of the affected landowners.

Finally, section 9.23B(3) of the SALDO (emphasis added) states:

> *No stormwater runoff or natural drainage shall be so diverted* as to overload existing drainage systems, or create flooding *or the need for additional drainage structures* on other private properties or public lands.

Landowner presented the expert testimony of Peter C. Andersen [3] (Andersen), a registered professional engineer. Andersen reviewed photographs and other exhibits reflecting a defined channel on the Property that was coincidental with discharge from the detention basin and did not appear on 1996 records or plans. According to Andersen, the photographs demonstrated that areas of stormwater

---

**3.** The Reproduced Record contains two different spellings, "Andersen" and "Anderson."

flow were diverted by the construction and 5 to 6 additional acres of stormwater flow were drained toward the Property, ultimately resulting in erosion and other consequences. Specifically, Andersen testified as follows:

The plans prepared in 1994 and '96 showed that the water entered the [Property] in a broad, flat swale [approximately] 60 feet wide. That water would flow onto the property, almost like it's sheet flow where the water is spread out, it's rather shallow. The depth of the swale was probably less than seven or eight inches at its maximum point, so the water was travelling across a wide area, and was hindered by the vegetation and it would go at a certain velocity. With the construction of the detention basin, there's a berm constructed across that ... swale, and the discharge was replaced with a 36–[inch] diameter pipe. So now all of the water that used to be dispersed across this wide, flat swale, was now being discharged out of a 36–[inch] diameter pipe. The velocity had to be increased. It's all coming out at one point. All the water is travelling downhill from a single 36–inch diameter pipe.

(R.R. at 101a–02a.) Andersen acknowledged that the District's plans for the expansion of a science wing would remediate some, but not all, of the problems he identified with the District's stormwater management techniques. (R.R. at 106a–07a.)

Roger Ruggles (Ruggles), a college professor with a doctorate in engineering science, testified for the District. He opined that, based upon his review of the SALDO, the District's stormwater management systems did not violate sections 9.23A(4), 9.23B(2), or 9.23B(3). Ruggles believed that the District did not violate section 9.23B(2), prohibiting the alteration of "existing points and patterns of natural drainage discharge," because the natural stormwater discharge flow onto the Property already had been concentrated. (R.R. at 316a–23a.) According to Ruggles, water goes from sheet flow to a shallow concentrated flow as it travels downhill. He stated that the total length from the top of the detention basin to the Property is about 1,300 feet, of which only the first 300 feet could be considered a sheet flow. (R.R. at 327a–28a.) Ruggles did not directly answer the question concerning whether that concentrate actually created a channel on the Property pre-construction. (R.R. at 331a–32a.)

On cross-examination, Ruggles acknowledged that he was not aware of the condition of the Property prior to the District's construction work. Ruggles also acknowledged that the conversion of drainage in a broad, 60–foot wide flat swale into a single channel with a 36–inch pipe constituted a concentration of water flow. He added, however, that after the flow is concentrated into the pipe, it exits into energy-dissipating rock and disperses again. (R.R. at 344a–47a.)

Ruggles additionally believed that the expansion construction was in compliance with the SALDO because it did not alter the point of stormwater discharge onto the Property and existing drainage systems were not overloaded. However, he agreed that, although the concentration of water in the detention basin decreased the rate of flow, it increased the total volume of water discharged, meaning that the land would be saturated for a longer period of time. Ruggles added that the infiltration proposed in the District's new plan allows water to go into the ground. (R.R. at 351a–56a.)

Curtis R. Eshelman (Eshelman), a certified forester, examined the Property in 2008 at Landowner's request. Eshelman testified that white pine trees were dying

in a concentrated area near the location of stormwater discharge. Eshelman stated that the trees were dying due to a loss of soil, which was a function of erosion resulting from the water flowing from the discharge pipe. He also stated that the channel of water flowing from the discharge pipe had increased in width over time from about three feet to six feet. Eshelman testified that the trees on either side of the eroded area were healthy. (R.R. at 161a–71a.)

Michael LaMana (LaMana), an expert in the field of forestry and natural resource science, was asked by the District to determine the reasons for the tree loss that was occurring on the Property. In pertinent part, LaMana testified that the mortality of white pine trees on the Property resulted from overcrowding and that the soil in which they were planted, Bowmansville soil, has a very high water table and is not conducive to growing white pine. He explained that the white pine were not amenable to very saturated soils because they do not have an appropriate root system and, therefore, cannot take constant saturation at any depth. (R.R. at 376a–81a.)

On cross-examination, LaMana acknowledged that he did not visit the Property, he did not take any measurements, and he was not aware that the Property's pond is 20 feet lower than the tree stand. LaMana also acknowledged that the maps upon which he relied to form his opinions were approximations only and that the Bowmansville soil could actually be hundreds of feet away from the trees. (R.R. at 396a.)

Following the hearing, the trial court requested the parties to submit findings of fact and conclusions of law, but it did not issue an adjudication. Subsequently, the trial court learned that Landowner had withdrawn her appeal from the science wing project and that construction of the science wing had commenced. The trial court reopened the record and held a hearing on September 9, 2011.

Evidence presented at that hearing reflected that the science wing project was approximately 80% completed. At this point in time, about 90% of the District's planned stormwater management improvements had been completed, including: the enlargement of the detention basin; an additional infiltration system along Holicong Road; and an underground infiltration system in front of the high school. In addition, the 36–inch pipe was reduced in diameter to 24 inches. The District's stormwater management facilities incorporated suggestions from Andersen, Landowner's expert. The cost of the stormwater management facilities was approximately $620,000, and roughly 80% of the improvements resulted in a direct benefit to the Property. Most notably, of the 5 to 7 acres of drainage area that were originally diverted toward the Property during the high school and middle school expansions, approximately 2.7 acres were diverted back and away from the Property. Moreover, if the stadium construction were to begin, the Property would receive additional benefits because approximately 2 additional acres of land would have its stormwater flow diverted away from the Property. (Trial court op. at 4–5.)

On February 13, 2012, the trial court issued its decision and decree. In relevant part, the trial court found as follows. When Landowner moved to the Property, an 8–inch drainage pipe discharged stormwater runoff from District's soccer fields onto the Property. The record does not identify the precise location of the 8–inch pipe, but it appears to have been located close to where the 36–inch pipe and detention basin were later installed. Landowner did not receive notice that the District

had obtained land development approval. As part of the District's expansion construction, the 60-foot-wide slope was replaced by a 5- to 6-acre detention basin. The detention basin had a 15-foot high berm that collected water and directed it to a concrete conduit and 36-inch pipe. The District's construction efforts enlarged the area of District land that was diverted to the detention basin and drained onto the Property by 5 to 7 acres. The rate of flow onto the Property was reduced by 25%, but the total volume of stormwater discharged was increased as well as the duration of the discharge. A channel on the Property eroded after the District installed the detention basin, berm, and 36-inch pipe, and the increased volume of water allegedly resulted in the destruction of trees. The trees were among 500–700 planted by a prior owner in a stand near the Property's border. Roughly half of the trees in the stand, and the majority of trees damaged, are white pine. It is unclear what type of soil the trees were planted in, but expert testimony indicated they were planted in Bowmansville soil, in which white pine trees do not grow well. (Trial court op. at 2–3.)

In its decision, the trial court first stated that reopening the record had been necessary to fully and fairly adjudicate this matter because the science wing construction was directly related to the claims raised and did not begin until after the April 2010 hearing. The trial court next rejected the District's assertion that Landowner's claims were barred by governmental immunity. Citing E–Z Parks, Inc. v. Larson, 91 Pa.Cmwlth. 600, 498 A.2d 1364 (1985), the trial court explained that governmental immunity applies only to liability for damages and does not prevent recovery by way of injunctive relief. Citing Staffaroni v. City of Scranton, 153 Pa.

Cmwlth. 188, 620 A.2d 676 (1993), the trial court further observed that the real property exception to governmental immunity applies.[4] (Trial court op. at 5–7.) However, the trial court concluded that any alleged injury to the Property was not caused by the District's negligence.

In its analysis, the trial court first referred to the common law principles known as "the common enemy rule," quoting from Lucas v. Ford, 363 Pa. 153, 155–56, 69 A.2d 114, 116 (1949): "[o]nly where the water is diverted from its natural channel or where it is unreasonably or unnecessarily changed in quantity or quality has the lower [land]owner received a legal injury.... If that change is not unreasonable in relation to the use, any loss resulting to the owner of the lower land is damnum absque injuria [damage without wrongful act]." (Trial court op. at 8 (emphasis added).) The trial court then stated as follows:

In the case at bar, the quantity or quality of the water has not been unreasonably changed. The quantity of water has been increased, but the rate of flow has been reduced. Nothing in the record indicates the quality of the water has changed. While approximately 2.3 to 4.3 acres of drainage still flows toward the ... Property that originally did not, there is no evidence that this diversion of a "drainage area" constituted the diversion of a water channel or course. Also, there have been no changes in the actual location of the stormwater discharge points onto the [Property]. Finally, it is reasonable to conclude that the construction of the stormwater detention basin and the 36 inch pipe is a natural, proper, and profitable use of the [District's] land, as these changes were implemented when the

4. Section 8542(b)(3) of the Judicial Code, 42 Pa.C.S. § 8542(b)(3).

High School and Middle School expanded.

(Trial court op. at 8–9, citations omitted.)

Continuing its analysis, the trial court explained that the District was not negligent because it did not violate any SALDO provisions when it constructed the detention basin and 36-inch pipe during the high school and middle school expansions. Accepting Ruggles's expert testimony as credible and convincing and supported by the record, the trial court determined that: section 9.23B(3) of the SALDO was complied with because existing drainage systems were not overloaded; section 9.23B(2) of the SALDO was complied with because the detention basin and outlet pipe were installed at the same location as the 60-foot swale and therefore the water flow onto the Property was not altered or diverted; and section 9.23A(4) of the SALDO was not applicable because the water flow before the construction of the detention basin was not dispersed. (Trial court op. at 9–10.)

The trial court further determined that Landowner was not entitled to injunctive relief because she failed to establish a violation of the SALDO, and thus failed to establish negligence, and because the continued construction of the science wing will, in the future, reduce stormwater flow onto the Property to pre-development levels. Finally, the trial court noted a conflict in the evidence presented and concluded that the exact cause of the damage to Landowner's trees is "unclear" and could not be "adequately determined." (Trial court op. at 10–11.) Accordingly, the trial court entered judgment in favor of the District, and Landowner appeals.

On appeal,[5] Landowner argues that the trial court erred: in holding that Landowner did not demonstrate an exception to the "common enemy rule;" in determining that the District did not violate the applicable SALDO provisions and therefore was not negligent; in concluding that the District's construction of a stormwater detention basin and a 36-inch concrete pipe did not constitute an alteration of existing points, patterns, or the location of natural drainage, reflecting a violation of the applicable SALDO provisions; in denying injunctive relief on the basis that the District obtained land development approval from the township; and in concluding that Landowner did not establish a right to injunctive relief. Landowners also assert that the trial court abused its discretion by reopening the record and allowing the District to introduce evidence supporting an affirmative defense that had not been preserved in its New Matter or supported by evidence at trial.

### Discussion

We first address Landowner's assertion that the trial court abused its discretion in reopening the record. "The general rule is that a court may, in its discretion, reopen the case after a party has closed for the taking of additional testimony, but such matters are peculiarly within the sound discretion of the trial court." *Commonwealth v. Deitch Co.*, 449 Pa. 88, 100–01, 295 A.2d 834, 841 (1972). Particularly, "a case may be reopened where it is desirable that further testimony be taken in the interest of a more accurate adjudication and where an honest purpose would be justly served without

---

5. Our scope of review is limited to determining whether the trial court, sitting as a chancellor in equity, committed an error of law or abuse of discretion. We will not disturb the trial court's factual determinations absent an error of law or lack of support in the record. *Williams Township Board of Supervisors v. Williams Township Emergency Co., Inc.*, 986 A.2d 914, 920 n. 4 (Pa.Cmwlth.2009).

unfair disadvantage." *In re J.E.F.*, 487 Pa. 455, 459, 409 A.2d 1165, 1166 (1979).

Here, the trial court reopened the case at a time when it was not yet adjudicated. The trial court received additional evidence to secure an accurate depiction of the case's current state of facts and to assist it in obtaining a fair disposition without prejudicing the substantive or procedural rights of Landowner. Therefore, we conclude that the trial court did not abuse its discretion in reopening the record and receiving additional evidence. Accordingly, we affirm this portion of the trial court's decision and decree.

 Landowner next argues that the trial court erred in failing to recognize that the record demonstrates an exception to the common enemy rule, i.e., the general principle that the law regards surface waters as a common enemy which every proprietor must fight to get rid of as best he may. *Strauss v. Allentown*, 215 Pa. 96, 63 A. 1073 (1906).

> The owner of upper land has the right to have surface waters flowing on or over his land discharged through a natural water course onto the land of another.... He may make proper and profitable use of his land even though such use may result in some change in quality or quantity of the water flowing to the lower land.... From those rules it is clear that only where the water is diverted from its natural channel *or* where it is unreasonably or unnecessarily changed in quantity or quality has the lower owner received an injury.

*Chamberlin v. Ciaffoni*, 373 Pa. 430, 436, 96 A.2d 140, 143 (1953) (emphasis in original). Our Supreme Court restated the common enemy rule in *Leiper v. Heywood–Hall Construction Co.*, 381 Pa. 317, 113 A.2d 148 (1955), as follows:

> It is only where the owner of higher land is guilty of negligence which causes

unnecessary damage to the servient owner, *or where, by an artificial channel, he collects and discharges surface waters in a body* or precipitates them in greatly increased quantities upon his neighbor, that the latter may recover for any damage thereby inflicted.

*Id.* at 320–21, 113 A.2d at 149–50 (internal quotations omitted) (emphasis added). Quoting *Rau v. Wilden Acres, Inc.*, 376 Pa. 493, 494, 103 A.2d 422, 423 (1954), the court in *Leiper* continued:

> From a multitude of authorities the applicable law may be summarized as follows:
>
> A landowner *may not alter the natural flow of surface water on his property by concentrating it in an artificial channel and discharging it upon the lower land of his neighbor even though no more water is thereby collected than would naturally have flowed upon the neighbor's land in a diffused condition.* One may make improvements upon his own land, especially in the development of urban property, grade it and build upon it, without liability for any incidental effect upon adjoining property even though there may result some additional flow of surface water thereon through a natural watercourse, *but he may not, by artificial means, gather the water into a body and precipitate it on his neighbor's property.*

*Leiper*, 381 Pa. at 321, 113 A.2d at 150 (internal quotations omitted) (emphasis added).

In *Marlowe v. Lehigh Township*, 64 Pa. Cmwlth. 587, 441 A.2d 497, 501 (1982), this Court also relied on *Rau* and held that where surface water is artificially diverted or collected, a plaintiff sustains a cognizable injury if there has been an increase in the total volume of water discharged onto the land or if the volume remains un-

changed but is "discharged with augmented force." We noted in *Marlowe* that the legal wrong lies in the artificial diversion or collection of water itself, and we made these pronouncements without regard to the degree in which the volume or force is increased. A plaintiff need only show that a landowner collected and/or concentrated surface water from its natural channel through an artificial medium, and the water was discharged onto the plaintiff's property in an increased volume or force, however slight. *Rau,* 376 Pa. at 494–95, 103 A.2d at 423–24; *Marlowe,* 441 A.2d at 501.[6]

■ These principles were distilled by our Superior Court in *LaForm v. Bethlehem Township,* 346 Pa.Super. 512, 499 A.2d 1373, 1378 (1985) (en banc), which held that an upper landowner is liable for the effects of surface water running off his property in two distinct circumstances: (1) where the landowner has diverted the water from its natural channel by artificial means; or (2) where the landowner has unreasonably or unnecessarily increased the quantity or changed the quality of water discharged upon his neighbor. *Accord Fazio v. Fegley Oil Co.,* 714 A.2d 510, 513 (Pa.Cmwlth.1998) (adopting *LaForm*).

Here, in addressing the District's liability under the common enemy rule, the trial court determined that the increase in quantity of water was "reasonable," the installation of the detention basin and 36–inch pipe was "a proper and profitable use" of the District's land, and the water was discharged onto Landowner's Property at the same place before and after construction. (Trial court op at 8–9.) However, the trial court applied only the second standard set forth in *LaForm* (unreasonable or unnecessary change in quantity or quality), and overlooked the first (diversion from the natural channel by artificial means).

■ The determination of whether a landowner "has diverted the water from its natural channel by artificial means" does not involve consideration of the reasonableness of the change in quantity or location of water flowing onto the lower land. Rather, to establish liability, a plaintiff need only show that a landowner collected and/or concentrated surface water from its natural channel through an artificial medium and that the water was discharged onto the plaintiff's property in an increased volume or force, however, slight. *Rau,* 376 Pa. at 494–95, 103 A.2d at 423–24; *Fazio,* 714 A.2d at 513; *LaForm,* 499 A.2d at 1378; *Marlowe,* 441 A.2d at 501.

In this case, the trial court specifically found the following as fact. The natural, physical contour leading to Landowner's Property was a 60–foot–wide swale. Due to the District's construction, the swale was replaced by a 5– to 6–acre detention basin and a surrounding 15–foot high berm. The detention basin and berm collected additional surface water emanating from 5 to 7 acres (and after the science wing measures, 2 to 4 acres) of drainage area, which was diverted toward Landowner's Property as a result of the District's expansion projects. After collecting the additional surface water, the detention basin concentrated it to and through a 36–inch pipe, and the water intruding upon Landowner's Property increased in terms of total volume and duration of discharge. Finally, a channel on the Property eroded

---

6. *See also* 51 P.L.E. Waters § 107 ("The owner of a dominant tenement may not divert surface waters from their normal ways and channels, or concentrate water at a particular point so as to increase its force or velocity, either by making artificial channels or any other affirmative act ... even though no more water is thereby collected than would naturally have flowed upon a neighbor's land in a diffused condition.") (citations omitted).

after the District installed the detention basin, 36–inch pipe, and berm. (Trial court op. at 2–4, 8.)[7]

Accepting the trial court's findings as supported by the evidence, we conclude that the trial court erred in applying the "common enemy rule" to the facts of this case Indeed, the trial court's explicit findings that water was collected and diverted as a result of the District's expansion projects conflict with its conclusion that an exception to the common enemy rule is not established in this case, and accordingly the trial court's conclusion in that regard is reversed.[8]

 Landowner also argues that the trial court erred and/or abused its discretion in determining that the District was not negligent because it did not violate provisions of the SALDO. Landowner further asserts that the trial court erred by relying on the District's land development approval by the township as *per se* evidence that the District is not liable under the common enemy rule and/or did not violate the SALDO. We agree. "An equity action may be pursued to seek injunctive relief against existing or threatened nuisances even if the land, structures or activities that caused the nuisance had been authorized under the zoning procedure...." *Chase v. Eldred Borough*, 902 A.2d 992, 998 (Pa.Cmwlth.2006).

 In addition, to the extent that the trial court denied Landowner injunctive relief because the continued construction of the science wing project "will drastically reduce the stormwater flow onto the [Property]," (Trial court op. at 11), we conclude that this is not a proper basis to do so. In *Ridgeway Court, Inc. v. Landon Courts, Inc.*, 295 Pa.Super. 493, 442 A.2d 246 (1981), the Superior Court concluded that injunctive relief remains available absent a finding that the condition has been completely remedied at the time of the hearing. *Id.* at 248. Here, the trial court's purported finding and conclusion regarding the District's remediation is speculative, and, in any event, does not establish that Landowner's alleged wrongs have been fully rectified at the time of the hearing. Indeed, the trial court states that at the time of its decision, only 90% of the stormwater improvements have been completed; that only 2.7 out of the 5 to 7 acres of drainage area that was diverted to the Property has been diverted away from the Property; and that despite the District's correction efforts, Landowner continues to maintain that the overall water infiltration has not improved. (Trial court op. at 4–5.)

 Finally, we address the trial court's statement that the exact cause of the tree damage "cannot adequately be

**7.** Citing N.T., 4/26/2010, at 9–10, 14, 38, 73, 86, 148–151, N.T., 4/27/2010, at 149, 181, 184, and N.T., 9/9/2011, at 14, 86; located in R.R. at 24a–25a, 30a, 53a, 88a, 101a, 164a–67a, 322a, 354a, 357a, 458a, 530a.

**8.** We note that the trial court's analysis in this regard was not merely a resolution of conflicting testimony. Instead, the trial court found as fact that the District collected and diverted surface water from a 60-foot-wide swale to a detention basin that collected additional water and diverted all of it onto Landowner's Property, thereby increasing the total volume and duration of the discharge. These findings simply cannot be reconciled with the trial court's conclusion that the expansion projects did not divert stormwater from its natural flow. To establish liability, a plaintiff need only show that a landowner collected and/or concentrated surface water from its natural channel through an artificial medium and that the water was discharged onto the plaintiff's property in an increased volume or force, however, slight. *Rau*, 376 Pa. at 494–95, 103 A.2d at 423–24; *Fazio*, 714 A.2d at 513; *LaForm*, 499 A.2d at 1378; *Marlowe*, 441 A.2d at 501.

determined." (Trial court op. at 12.) It is not clear whether the trial court based this finding on determinations of witness credibility or evidentiary weight, or whether the trial court refrained from issuing a more definitive statement as a result of the errors identified above. Therefore, to the extent this statement constitutes a finding of fact, it is vacated.

For the foregoing reasons, we affirm in part, reverse in part, and vacate in part, and we remand the matter to the trial court to issue a new decision consistent with this opinion.

### ORDER

AND NOW, this 21st day of February, 2014, the May 25, 2012 order of the Court of Common Pleas of Bucks County (trial court) is affirmed in part, reversed in part and vacated in part. The case is remanded to the trial court for a new decision consistent with this opinion.

Jurisdiction relinquished.